ALBANY,
August, 1808.

Jackson, *ex dem.* J. G. Klock and G. G. Klock and others, *against* Hudson.

Jackson
v.
Hudson.

THIS was an action of *ejectment*, for lands in *Montgomery* county. The cause was tried at the *Montgomery* circuit, before Mr. Justice *Van Ness*, in *October*, 1807.

The plaintiff gave in evidence a lease from *George Klock*, the father of the lessors of the plaintiff, to *Jacob Forbush* and *Bartholomew Forbush*, dated the 6th *September*, 1783, for a farm, known by lots no. 7 and 8. on the *Mohawk* river, at *Conajohary*, " containing 600 acres of low and cribble bush lands," for the term of three years, at a yearly rent of 30 *skipples* of wheat, with clause of re-entry for the non-payment of the rent, &c.

The plaintiff then proved by *Peter P. Schuyler*, aged 60 years, that the lessees were in possession of the premises in question under that lease, and lived there about eight years after, and that they lived on the land a year or two previous to the lease, before which they said that the land belonged to the *Indians*, and was called *Indian* land ; that they recognised no particular title when they entered, and that they considered the land as vacant ; that the *Klocks* claimed the land, and threatened to turn them out ; that the *Indians* had been in the exclusive possession of the *Conajohary Castle* tract, (of which the premises in question are parcel,) as long as the witness could remember, and so continued until they went to *Canada*, in the revolutionary war ; that after the *Indians* had so departed, *John Peter Revershang*, who was married to an *Indian squaw*, claimed the whole tract, in right of his

The posses-sion of a tract of land by the native *Indians*, does not affect the validity of a patent from the state, granting the land to white persons, without the consent of the *Indians*. The legality of such a patent is a po-litical question, which cannot arise or be dis-cussed, in a suit between two of our own citizens. The possession of the native *Indians*, is not such an adverse possession, as to render sub-sequent aliena-tions by the pa-tentees, void, on the ground of *maintenance*. Where the de-fendant in *eject-ment* sets up an outstanding ti-tle, it must be a present, sub-sisting and op-erative title, otherwise, the presumption is, that such title

in a stranger has been extinguished. An outstanding title, in certain *Indians* of the *Mohawk* tribe, was held to be extinguished, as the title had never been claimed or asserted, and the tribe or nation had become extinct.

Where a deed may enure several ways, the grantee shall have his election which way to take it. An exception in a deed shall be taken most favourably to the grantee, and if it be not set down or described with certainty, the grantee shall have the benefit which may arise from such defect.

wife ; that *Jacob Forbush*, one of the lessors of the plaintiff, first took possession of another piece of land in the *Conajohary Castle* tract, and improved it for some time, when the *Indians* ousted him, and told him to go and take other lands; that *Forbush* then entered on part of the premises, and soon after took the lease abovementioned ; that no person claimed any adverse interest in the *Conajohary Castle* tract, during the possession thereof by the *Indians ;* that *George Klock* lived about four miles from the said tract ; that the *Conajohary Castle* tract was very valuable, and contained a great portion of low land : that the *Forbushes* admitted that they paid rent to *Klock* under the lease ; that *Klock* claimed the whole *Conajohary Castle* tract, at the time of giving the lease, and died in 1789 or 1790 ; that the two lessors of the plaintiff named, pretended to claim the whole tract after *Klock's* death, and that the lessors of the plaintiff are his heirs at law.

The plaintiff having here rested his cause, the defendant gave in evidence ;

1. The letters patent, dated the 13th *November*, 1731, to *A. Van Horne*, *W. Provost*, and *C. Livingston*, (three of the colony council) and *Mary Burnet*, daughter of governor *Burnet*, for 8,000 acres of land, including the *Conajohary Castle* tract.

2. A release and quit-claim, dated 22d *November*, 1763, from *P. Livingston*, *W. Livingston*, *G. Klock*, and three others, styling themselves part owners of the tract mentioned in the said letters patent, in consideration of five shillings, to three *Indians*, by name, in fee, of a tract of land described by metes and bounds, in trust for them, and all the rest of the native *Indians*, belonging to the *Conajohary Castle*, and their heirs.

3. Authentic copies of the map and field book of the partition of the patent, made the 9th *October*, 1764, by which the *Conajohary Castle* tract was set off into an allotment by itself, and the rest of the patent laid out into five allotments. The 1st, 2d, 3d, and 4th allotments contained each about 800 acres, and were divided into eight lots

each, and the 5th allotment divided into four lots of 200 acres each. The *Conajohary Castle* tract formed the 6th allotment, and was laid out into four lots of 850 acres each, and is described in the field book as in the possession of the *Mohawk Indians* of the *Conajohary Castle*, by virtue of a deed to them in fee executed, by *Philip Livingston*, *William Livingston*, *Walter Rutherford*, and *John Duncan;* being four of the six persons, who executed the release of 1773. The field book refers generally to the deed. No other proceedings relative to the partition were produced.

4. A release from *George Klock* to *Jellis Fonda*, dated the 27th *January*, 1767, for several parcels of land in the five first allotments, and a specific fourth part of lot no. 1. in the 6th allotment. This release refers to the partition, and the map and field book thereof.

5. A release from *George Klock* to *Johannes Luke*, in 1784, for the residue of lot no. 1. in the first allotment.

The defendant further proved, by *P. P. Schuyler*, that in 1790 or 1791, the two lessors of the plaintiff named, gave him and the *Forbushes*, separate agreements, in writing, whereby they stipulated to give separate leases for 21 years, of their lands within the *Conajohary Castle* tract, whenever they the said lessors of the plaintiff, should obtain a grant or confirmation for the same, from the state. These agreements were afterwards given up.

It was next proved, by *Christian Nellis*, that shortly after the death of *George Klock*, the two lessors of the plaintiff named, attempted to purchase of certain *Indians*, the lands within the *Conajohary Castle* tract, though informed that the *Indians*, with whom they were contracting, did not belong to the *Conajohary Castle.*

The defendant then read a paper writing, signed and sealed by the two lessors named, and *Michael Kirn*, relative to a part of the *Conajohary Castle* tract. It was dated the 28th *September*, 1790, and was a covenant with *Kirn;* that as soon as they, the *Klocks*, should obtain a

patent or confirmation for the lands leased by them of the *Indians*, in *Conajohary Castle*, they would execute a lease of the same to *Kirn*, for 21 years, at a rent of 5*l.* a year.

Two other papers were read relative to other parts of the said tract, of a similar import, which were signed by the two lessors of the plaintiff named, the one dated the 29th *September*, 1790, and the other, the 10th *January*, 1791.

It was next proved, by *Christian Donstader*, who was 90 years of age, that he had known the *Conajohary Castle* from his youth; that the *Indians* always had the exclusive possession of the *Conajohary Castle* tract, until they went away in the revolutionary war; that several white persons, at different times, improved part of the tract under the *Indians ;* that shortly after the *French* war, *George Klock* made a purchase of some *Squaws* and *Indian* children, of a part of the *Conajohary Castle* tract, situated below the premises.

The defendant then gave in evidence a deed in fee, from the executors of *Jellis Fonda* to him, for a part of the premises, dated the 9th *May*, 1792, and a deed from *C. P. Yates*, to him in fee, dated 2d *January*, 1792, for the residue of the premises, containing in the whole 102 acres.

*Hendrick Frey* testified, that the lands in the first five allotments were held according to the partition of 1764, and that he, in 1762 or 1763, by agreement between the *Conajohary Indians* and the proprietors, under the said patent, ran a division between the *Conajohary Castle* tract, and the residue of the patent, corresponding with that adopted in the partition of 1764, which was uniformly adhered to by all parties, until the *Indians* went away ; that when the commissioners commenced the survey of the *Conajohary Castle* tract, they were opposed by the *Indians*.

The plaintiff then gave in evidence ;

1. A release from *Provost*, to *P. Livingston*, dated the 7th *November*, 1734, for one quarter of the patent, for the consideration of 100*l.*

2. The will of *P. Livingston*, dated the 15th *July* 1748, by which he devised the estate in this patent to his eight children, in fee.

3. A deed from the devisees to *Jellis Fonda* and *George Klock*, dated 3d *February*, 1761, for the consideration of 2,400*l.* for one half of the said patent, excepting 1,000 acres before conveyed to *David Schuyler*.

4. A deed, in fee, from *D. Van Horne* and *S. Van Horne*, the heirs of *A. Van Horne*, one of the patentees to *Jellis Fonda* and *George Klock*, dated 3d *February*, 1761, for the consideration of 1,200*l.* for one fourth of the patent, excepting 500 acres before conveyed to *David Schuyler*.

It was admitted, that the premises were in lot no. 2. of the 6th allotment, as laid down in the map and field book, abovementioned.

*Wilhelmus Dillenback*, aged 90 years, who was called on the part of the plaintiff, proved, that soon after the *French* war, he witnessed a deed executed by several *Indians*, to *Jellis Fonda* and *George Klock*. The plaintiff's counsel refused to produce this deed, though it was called for, in pursuance of a notice to that purpose.

The jury, agreeably to the charge of the judge, gave a verdict for the plaintiff, for three-eighths of the premises.

A motion was made at the last *February* term, to set aside the verdict, as against law and evidence.

·*Cady* and *Van Vechten*, for the defendant. The verdict in this case is for the undivided three-eighth parts of the tract. If it can be shown that the plaintiff's right, if any, was divided, or that if he once had a title, he has parted with it, the verdict must be set aside. *George Klock* was not one of the original patentees, in 1731. If he had any title, it must have been under the conveyance in 1761. But, at that time, the *Indians* were in the actual and exclusive possession of the tract. The testimony of *Schuyler* fully proves, that they had the adverse and exclusive possession of the land. It was not a temporary

ALBANY,
August, 1808.

Jackson
v.
Hudson.

ALBANY,
August, 1808.

Jackson
v.
Hudson.

* 1 Johns. 159.

possession, for the sake of hunting or the chase, but a permanent possession for the purposes of agriculture ; they made leases and received rent. The deed, therefore, of 1761, was void, for a person out of possession cannot convey a valid title.* The release in 1763, from *Livingston, George Klock*, and others, to three *Indians* only, could not give a title ; and if it did, then *Klock* had parted with the title he held.

The conduct of the lessors of the plaintiff, from 1761 to the commencement of the present action, has been in direct hostility to the title now set up. For though *Klock* pretended to hold the whole tract under the deed, yet, after the *French* war, he purchased of some of the *Indians*.

In 1790, or 1791, two of the lessors of the plaintiff, sons of *George Klock*, agreed with *M. Kirn*, to give him a lease as soon as they obtained a grant or confirmation of their title from the state. If they had a title, by descent or purchase, why should they desire a grant from the state ? So impressed were they with the defect of their title, that they endeavoured to obtain deeds from any of the *Indians* who could be induced to execute a conveyance.

*J.* and *B. Forbush* never took possession under the title of 1761. They first entered into possession under the *Indians ;* and, by their direction, left their first possession, and went to another part of the tract, thereby recognising the *Indian* title. They afterwards took a lease from *Klock* ; but it is evident, that this was done merely to protect themselves from being again dispossessed by the *Indians*, and was, in fact, collusive. All the acts of *Fonda* and *Klock* are not only in disaffirmance of the title under which the plaintiff claims, but show that they uniformly claimed to hold under the *Indians*. They not only recognised the *Indian* title ; but the *Indians* themselves asserted their right, by resisting the surveyors, who attempted to run the lines of the tract.

The deed of partition in 1764 states, that the *Indians* were in possession of the *Castle* tract, by virtue of a re-

ALBANY,
August, 1808.

Jackson
v.
Hudson.

lease from *Livingston* and three others. Though *Klock* is not there named, it must be presumed, that he had released to *Livingston*, and it is admitted, that a release from *Fonda* was to be presumed. This presumption is confirmed by the concurrent acts of *Klock* himself, and is strongly fortified by his long silence and acquiescence ; for living within three or four miles of the premises, he quietly permitted strangers to retain possession. He exercised no act of ownership until 1783, when he merely gave a lease for three years, and with covenants for quiet enjoyment, which lease was manifestly collusive and fraudulent.

This possession has been uninterrupted and undisturbed from 1763 to the present time. Courts, in many cases, have gone far in supporting the presumption arising from a long and undisturbed possession, or long recognition of right under a deed.* It is true, that the doctrine of presumption admits, that it may be rebutted by evidence to the contrary. But here no such evidence appears.

Again, it appears that the representatives of *P. Livingston* conveyed one half of the tract, excepting 1,000 acres before conveyed to *David Schuyler*. And then, the heirs of *Van Horne* conveyed a fourth part, excepting 500 acres conveyed to *Schuyler*. .

Now, how does it appear that the deed under which the plaintiff claims, covers the residue, after deducting the two parcels belonging to *Schuyler* ? Until these excepted parcels are first located, the deed cannot operate, or the land intended to be conveyed by it, be located. The plaintiff claiming under the indenture ought to have produced the map to which it refers.

That there was a partition in 1764, is manifest, from the evidence, and the deed from *Klock* to *Fonda*, in 1767, refers to and recognises the partition. If *Klock*, then, had any title, it was in severalty, and ought to have been deduced under the deed of partition. An undivided three-eighths could not be recovered.

* 12 *Co. 5. Bedell's case. Cowper*, 216, 217. 597. 2 *W. Black.* 1228. 2 *Caines*, 169. 382. 1 *Caines*, 84.

*Hildreth*, contra. *Klock* was in full possession from 1783 to 1789, when he died ; any right of entry, which the defendant had, was, therefore, tolled, supposing *Klock* to be a mere disseisor. It is said, that the deed of 1761, to *Klock* and *Fonda*, was void, on account of the adverse possession of the *Indians*. But they were also in possession in 1731, when the letters patent were issued, and can it be admitted that such a possession by the native *Indians*, is to defeat a patent issued by the government ?

The wandering and unsettled life of the *Indians* is wholly inconsistent with the idea of a permanent and adverse possession. The manner in which they occupied the land, cannot produce that kind of adverse possession, which is intended by the common law, and which the statute relative to *maintenance* had in view. The plaintiffs have produced sufficient evidence of a possessory title to maintain the action. It is true, that if the defendant can show a subsisting title out of the lessors of the plaintiff, they cannot recover ; but this must be an actually subsisting title, connected with a possession within 20 years.* Merely to show that there has been a title once existing in some other person, is not sufficient. But the lessors of the plaintiff have produced a regular paper title, sufficient to enable them to recover. If *Fonda* and *Klock* were tenants in common, the entry of one is the entry of both, and such entry will be according to the title. *Klock* had a right to locate the parcels conveyed to *D. Schuyler*, as he pleased, since there was no specific location mentioned in the exception of them in the deeds. It is objected, that there was no act of ownership from 1763 to 1783 ; but it is well known that the *Indians* were powerful, and it would have been the greatest rashness and folly for *Klock* to attempt to assert his rights against them. After the *Indians* had gone, and peace was restored, he entered and took possession, and remained in possession until his death.

* *Buller's N.
P.* 110.

KENT, Ch. J. delivered the opinion of the court. The lessors of the plaintiff have made out the following paper title to the premises.

1. A patent from government in the year 1731, for 8,000 acres of land, and which included the *Conajohary Castle* tract, of which the premises in question are a part.

2. A release from one of the four patentees, in the year 1734, to *Philip Livingston*, another of the patentees, for his one-fourth part of the tract. This release invested *Livingston* with a moiety of the lands.

3. The will of *Livingston* in the year 1748, by which he devised his estate in the patent, to his eight children, in fee.

4. A deed from the devisees, in the year 1761, to *Jellis Fonda* and *George Klock*, for a moiety of the same patent, excepting 1,000 acres before conveyed to *David Schuyler.*

5. A deed from the heirs of *Van Horne*, another of the patentees, in the same year (1761) to *Fonda* and *Klock*, for a fourth part of the patent, excepting 500 acres before conveyed to *David Schuyler.*

These several conveyances invested *George Klock*, the father of the lessors of the plaintiff, with the title to an undivided fourth part and an undivided eighth part of lot no. 2. in the *Conajohary Castle* tract, (being the premises in dispute) provided the portions of land previously conveyed to *Schuyler* are located in some other part of the tract, and the fourth and the eighth parts amount to three-eighths of the premises, or the quantity of land recovered by the verdict. The lessors of the plaintiff were proved to be the heirs at law of *Klock;* and this title, so deduced, is *prima facie* evidence of a good title to the premises, to the extent of the recovery. We are next to examine the several objections which the defendant has raised to its validity.

He has not set up any title in himself under the patent, except it be a deed from the executors of *Fonda*

in the year 1792, for a part of the premises, and a deed from *C. P. Yates*, in the same year, for the residue of the premises. These deeds were given only seven years before the commencement of the present suit. The deed from *Yates* conveyed no title, because, there is no evidence that he had any title, or that he was ever in possession ; and the deed from the executors of *Fonda* (admitting that they were authorised to convey) could have operated only on the undivided share of their testator in the lot in question, as the release from *Klock* to *Fonda*, in the year 1767, was for another part of the castle tract.

The first objection raised to the plaintiff's title is, that the *Mohawk Indians* of the *Conajohary Castle* were in possession of the premises, as well as of the whole *Conajohary Castle* tract, in the year 1761, and possessed it as their own, and, consequently, that here was an adverse possession, which rendered the deed of 1761 inoperative.

It appeared that the *Mohawk Indians* had the exclusive possession of the *Conajohary Castle* tract, not only in 1761, but as far back as the memory of witnesses could reach, and one of the witnesses who testified to this effect, was 90 years of age. The *Indians* must, then, have been in possession of this tract when the letters patent issued, in 1731 ; but this possession can never be urged against the validity of the patent, or of any of the subsequent conveyances under it. The defendant did not object to the legality of the patent, for he introduced it, and yet it must be apparent, that if the possession of the *Indians* was sufficient to destroy the operation of the deeds in 1761, it would be equally effectual to destroy the grant from government, in 1731. Such a suggestion, however, is inadmissible. The policy, or the abstract right of granting lands in the possession of the native *Indians*, without their previous consent, as original lords of the soil, is a political question with which we

have at present nothing to do. It cannot arise or be dis- ALBANY, August, 1808.
cussed in a contest between two of our own citizens, nei-
ther of whom deduce any title from the *Indians*. What Jackson v. Hudson.
would be the effect of an *Indian* possession or title, in op-
position to the grant under the patent, if they were to be
brought into collision, is not a question before us. No
such title is set up, and the *Mohawk Indians* have, from
the time of the *American* war, ceased to claim or occupy the
lands. The most decent presumption is, that the *Cona-
johary Castle* lands had been previously purchased by
government. At any rate, no *Indian* claim exists, nor does it
appear that any controversy with the *Indians*, as to title,
has ever existed. The competency of government to grant,
cannot be called in question. As to the subsequent
alienations under the patent, the doctrine of the common
law rendering void the sale of lands, while they are in ad-
verse possession, does not apply. The evil of mainte-
nance could not exist in the case. That evil consisted
in selling contentions and law-suits, " whereby right
might be trodden down, and the weak oppressed." But
the *Mohawk Indians* of the *Conajohary* (or *Upper Mo-
hawk*) *Castle*, existed and occupied the lands in question,
as part of an independent tribe. This tribe inhabited
what was formerly called the *Upper* and *Lower Mohawk
Castles*, and was never held amenable to the jurisdiction
of our courts of justice. They possessed their lands in
common as belonging to the community, and they con-
tinued to be recognised in their independent or national
character by the colony government, long after the date of
the patent, in 1731, and even down to the time of the
*American* war. This historical fact could be abundantly
proved, if requisite, by a reference to the public docu-
ments of the country, but it may here be assumed as a
fact of public notoriety. The conveyance from one indi-
vidual to another, of a title to these *Indian Castles*, was
not, then, a conveyance of a right *in action*, since no ac-

ALBANY,
August, 1808.

Jackson
v.
Hudson.

tion could have been sustained against the *Mohawk* tribe.

The next point raised to destroy the effect of the plaintiff's title, consisted in the allegation of an existing title out of the lessors of the plaintiff, and which was supposed to reside in these same *Indians* of the *Conajohary Castle*, or in some part of them. This *Indian* title was deduced from the release of *Livingston* in the year 1763, to three *Indians* by name, in trust, for them and all the *Indians* of the *Conajohary Castle*. Several objections occur to defeat the force of this objection. If a defendant sets up an outstanding title existing in a stranger, it must be a present subsisting title; it must be one that is living and operative, otherwise the presumption will be that it has become extinguished. Considering the nature of this obstacle, raised by a defendant who has no title, to defeat a plaintiff who shows a good title, the presumption as between them of an extinguishment of the outstanding title, ought to be pretty liberally indulged. It has, accordingly, been held, that the production of an old outstanding lease was not sufficient without showing a possession under it within 20 years, and that a mortgage deed would not be evidence of a subsisting title, if the mortgagee never entered, and no interest had been paid within 20 years. (*Buller's N. P.* 110.)

In the present case, there is good ground to presume an extinction of the *Mohawks*, as a separate tribe. From the time of the *American* war down to the trial, we hear nothing of the three trustees, or of their *cestui que trusts*. No person during all that lapse of time, has appeared under that release, either as a party or a reversioner, to deduce any title or claim founded upon it. The presumption is, therefore, irresistible, that it is no longer a subsisting title. But a still more decisive objection to the release is, that it does not appear ever to have been executed by *Klock*, notwithstanding his name is mentioned in the body of it; and no subsisting title, under the patent, is shown to have existed at that time, in the other

grantors.  The possession of the *Indians* from 1763, to the *American* war, was not of itself sufficient to justify an inference of a title derived from the releasors, because the *Indian* possession was merely a continuation of that which had existed from time immemorial.  Nor can the presumption of a deed to the *Indians*, be deduced from the note or memorandum in the field-book of 1764, since the presumption is rebutted by the fact, that in 12 or 14 years after that time, the *Indians* abandoned the premises, and have never since returned.  But it is evident, that the field-book memorandum alluded to the release of 1763, and it demonstrates, that *George Klock* never was a party to the release, for it specifies the names of the actual releasors.  There was, then, never any outstanding title as against *him ;* and the other parties were, for aught that appears, strangers, who had no right to give a release ; and if any title passed, it is not now a subsisting one, since the *Mohawk Indians* of the *Conajohary Castle* have long since disappeared from the face of the country.  *Etiam periere ruinœ.*

Another objection to the plaintiff's title, is deduced from the exception in the deeds of 1761, of the 1,000 and of the 500 acres, previously conveyed to *Schuyler.*  In what part of the tract, covered by the patent, these two portions of land had been previously located, does not appear.  There was land sufficient to supply them, without touching any part of the premises ; and as the deeds were not explicit, *Klock*, the grantee, was left at liberty to locate these excepted tracts, in whatever part of the patent he pleased, as against every other person but *Schuyler.*  Where a deed may enure in different ways, the grantee shall have his election which way to take it.  An exception in a deed is always to be taken most favourably for the grantee, and if it be not set down and described, with certainty, the grantee shall have the benefit of the defect.

There is, then, no weight in this objection, and upon a full consideration of the case, the court are of opinion, that

the motion on the part of the defendant, for a new trial, must be denied.

SPENCER, J. having been formerly concerned as counsel in the cause, declined giving an opinion.

Rule refused.